**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARGILL INCORPORATED and CAN TECHNOLOGIES, <br><br>                      Plaintiffs,<br>vs.<br><br>MATTHEW BUDINE, DOUGLAS W. DEGROFF, DIVERSIFIED DAIRY SOLUTIONS, LLC, LUCIANA JONKMAN, PROGRESSIVE DAIRY SOLUTIONS, TODD SCHWEGEL, and BRIAN SUNDBERG<br>                      Defendants.<br>_____/<br>MATTHEW BUDINE, PROGRESSIVE DAIRY SOLUTIONS, LUCIANA JONKMAN, and BRIAN SUNDBERG,<br>                      Counter-claimants,<br>vs.<br>CARGILL INCORPORATED and CAN TECHNOLOGIES,<br>                      Counter-defendants.<br>_____/ | CASE NO. CV-F-07-349- LJO-SMS<br><br>**ORDER ON CARGILL'S MOTION TO DISMISS ANTITRUST CLAIMS** (Doc. 118) |

**I. INTRODUCTION**

Plaintiffs-Counter-defendants Cargill Incorporated and CAN Technologies, Inc. (collectively

1

"Cargill") move to dismiss Defendants-Counter-claimants Progressive Dairy Solutions, Inc., Matthew Budine, Luciana Jonkman, and Brian Sundberg's (collectively "Progressive's") antitrust counterclaims for lack of antitrust standing and/or failure to state a claim. This Court finds that Progressive lacks antitrust standing because Progressive is not a participant in the relevant market and that Progressive's injury is in a different market and is indirect. Additionally, while Progressive sufficiently has pleaded the relevant markets, Progressive's claims of market share do not meet the plausibility standard of *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955 (2007). Therefore, Cargill's motion to dismiss is GRANTED with LEAVE to AMEND.

## II. BACKGROUND

Progressive is a consultant to dairy farmers throughout the United States and works with those farmers to create custom feed formulations designed to maximize overall animal health, milk production, reproduction and growth.[1] Progressive does not manufacture feed but bids out its feed formulations to feed manufacturers for production. Cargill is a manufacturer of formulated feed for dairy herds. Progressive allows customers to bid out Progressive formulations to one or more feed manufacturers, including Cargill. Cargill Animal Nutrition ("CAN"), a division of Cargill, also provides formulation services to customers who buy Cargill's feed. Progressive defendants Budine, Jonkman, and Sundberg performed feed formulation services while employed at CAN. They now perform these services at Progressive.

Blood meal is the pasturized, dried and powered blood of animals. It is used in feed formulations as a source of protein and is derived from different animal sources, including cows and pigs. Progressive and other feed formulators and manufacturers prefer using beef blood meal in their formulae because it provides the most cost-effective nutritional benefit for cows.

In its First Amended Counter Complaint ("FACC"), Progressive claims, among other things, that "in a direct attempt to harm" Progressive, Cargill "purchased essentially the entire beef blood meal supply

---

[1] The facts are taken from the First Amended Counterclaim ("FACC"), unless otherwise noted, and will be accepted as true in this motion. *Jenkins v. McKeithen*, 395 U.S. 411, 421, *reh'g denied*, 396 U.S. 869 (1969)

in certain Western U.S. states"[2] to "corner the market'" on beef blood meal. After purchasing "much if not all of the beef blood meal available" in the West Coast Region, Cargill charges dairy farmers using non-Cargill formulae a higher price for feed incorporating beef blood meal than it offers to customers who agree to purchase beef blood meal as a component of animal feed formulated and manufactured by Cargill. Based on these allegations, Progressive pleads the following causes of action subject to Cargill's motion to dismiss: conspiracy to monopolize (Count Four), attempt to monopolize (Count Five), and monopolization (Count Six) pursuant to Section 2 of the Sherman Act (15 U.S.C. §2), and restraint of trade pursuant to Section 3 of the Clayton Act (15 U.S.C. §14) and Section 2 of the Sherman Act (Count Seven) (collectively "antitrust counterclaims").[3]

Cargill filed this motion to dismiss on July 27, 2007 (Doc. 118). Progressive filed an opposition to the motion to dismiss on August 18, 2007 (Docs. 120, 121). Cargill filed a reply on August 21, 2007 (Doc. 122). The Court considered these documents, vacated the August 28, 2007 hearing pursuant to Local Rule 78-230(h), and issues the following order.

### III. ANALYSIS

**A.     Fed. R. Civ. P. 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In considering a motion to dismiss for failure to state a claim, the court must accept as true the allegations of the complaint in question, construe the pleading in the light most favorable to the party opposing the motion, and resolve all doubts in the pleader's favor. *Jenkins v. McKeithen*, 395 U.S. 411, 421, *reh'g denied*, 396 U.S. 869 (1969); *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 740 (1976).

---

[2] The states identified in the FACC are California, Arizona, Texas, Colorado, and Nebraska, . These states and "other continuous states, subject to further investigation and discovery" are collectively referred to as "the West Coast Region."

[3] In the motion to dismiss, Cargill only sought to dismiss Counts Four through Six. In its Reply, Cargill notes that Progressive correctly pointed out Cargill's oversight in not seeking to dismiss Count Seven (restraint of trade). Cargill requests that this Court consider Count Seven in the instant motion. Cargill also makes clear that if the Court does not consider Count Seven now, Cargill will seek summary judgment or a separate motion to dismiss for lack of standing on this Count. Having considered the lack of prejudice to Progressive and judicial economy, this Court rules that although Cargill should not raise new issues in its reply, Count Seven will be included in this Order.

Although courts assume the facts alleged as true, courts do not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted). In the antitrust setting, the Supreme Court announced that "the need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'show that the pleader is entitled to relief.'" *Id.* at 1966. In *Twombly*, 127 S. Ct. 1955, 1966-67, the Court further ruled

> [I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago...a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed. (internal citations and quotations omitted)

**B.    Antitrust Standing**

   **1.    Standard of Review**

Private suits to enforce the Sherman Act are authorized by Section 4 of the Clayton Act (15 U.S.C. §15(a)), which provides that "any person who shall be injured in his business...by reason of anything forbidden in the antitrust laws may sue..." *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 987 (9th Cir. 2000). Despite the broad language of this provision, the Supreme Court ruled that Congress did not intend to afford a private remedy to everyone injured by an antitrust violation simply on a showing of causation. *Associated Gen. Contractors of California, Inc. v. California State Council Carpenters*, 459 U.S. 519, 535 (1983). Instead, antitrust lawsuits were restricted to those who had "antitrust standing." Distinguished from Constitutional standing, antitrust standing requires a "further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.*[4]

To determine whether a party has antitrust standing, the court must "evaluate the plaintiff's harm,

---

[4] The Ninth Circuit Court of Appeals has characterized "antitrust standing" to be subsumed into the broader concept of determining whether a given plaintiff is a proper party to bring an antitrust action. See *Lucas v. Bechtel Corp.*, 800 F.2d 839, 843 n.6 (9th Cir. 1986); *Bhan*, 772 F.2d at 1469-70 n.2 (9th Cir. 1985).

4

the alleged wrongdoing by the defendants, and the relationship between them." *Associated Gen. Contractors*, 459 U.S. 519, 535 (1983). Several factors determine whether a complainant has antitrust standing. *Associated General Contractors*, 459 U.S. 519, 519 (1983). These factors include: (1) the nature of the complainants' alleged injury; (2) the directness of the injury; (3) the speculative measures of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *American Ad Management, Inc. v. General Tel. Co. of California, 190 F.3d 1051, 1054-55 (9th Cir. 1999); Eagle v. Star-Kist Foods, Inc*., 812 F.2d 538, 540 (9th Cir. 1987). The complainant need not prevail on each factor to establish standing, and no single factor is dispositive, although the "absence of antitrust injury is fatal." *Toscano v. PGA Tour, Inc*., 201 F. Supp. 2d 1106, 1116 (E.D. Cal. 2002); see also *Lucas v. Bechtel Corp*., 800 F.2d 839, 844 (9th Cir. 1986) ("The first factor is of tremendous significance.") Cargill argues that the Progressive has not alleged an antitrust injury and any such injury is indirect.

### 2. Antitrust Injury

To have standing to bring an antitrust claim, the complainant's injury must actually be an "antitrust injury, which is to say an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Am. Ad Management, Inc. v. GTE*, 190 F.3d 1051, 1055 (9th Cir. 1999). Cargill argues that Progressive's monopolization claims must fail because: (1) any injury alleged would not amount to an *antitrust* injury; (2) Progressive is not a participant in the same market as Cargill and cannot plead an antitrust injury; and (3) Progressive has not suffered an injury in the same market where competition is being restrained. Progressive argues that it has suffered and pleaded an antitrust injury.

#### a. Injury Harmful to Competition

"An antitrust injury is 'an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Atlantic Richfield v. USA Petroleum*, 495 U.S. 328, 334, 110 S. Ct. 1884 (1990) (citations omitted). Antitrust injury "stems from the competition-reducing aspect or effect of the defendant's behavior." *Id.* "Antitrust laws in general, and the Sherman Act in particular...are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *Associated*

*General*, 459 U.S. 519, 539, n. 38 (citing *United States v. Topco Associates, Inc*., 405 U.S. 596, 610 (1972)).  The freedom to compete is fundamental in our free-enterprise society, which includes the right to "assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster." *Topco*, 405 U.S. 596, 610.  As such, antitrust laws were enacted for "the protection of *competition*, not *competitors*." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (emphasis in original).

Cargill argues that Progressive's FACC does not state any injury implicating the types of activity antitrust laws were designed to protect.  Cargill asserts that Progressive's allegations are "nothing more than complaints that competition from Cargill has hurt their business by forcing their customers' feed manufacturers to seek beef blood meal from sources that the Progressive Defendants feel are too costly or inconvenient.  Cargill has a right to compete in the beef blood meal market–or whatever the relevant market may be."  Cargill argues that the activity alleged can not be monopolization, because Cargill is a purchaser of beef blood meal, rather than a producer and there are other sources of beef blood meal.  Thus, Cargill concludes that the allegations, if accepted as true, only demonstrate Cargill's competition in the marketplace.

In opposition to this motion, Progressive does not clearly identify what antitrust injury, if any, it has suffered.  While Progressive alleges that Cargill engages in "impermissible vertical restraint in the form of discriminatory pricing," Progressive does not cite any legal authority to define such a theory or support this argument as it relates to the specific facts in the FACC.  Furthermore, the way in which Progressive characterizes its counterclaims is at times inconsistent with its own allegations.[5]  Looking directly at the FACC, however, this Court finds that Progressive has alleged activity which would result in an antitrust injury, if accepted as true.

---

[5] For example, Progressive argues that farmers gain access to "the reduced price on beef blood meal" only when they use Cargill formulations, "which Cargill can subsidize because it is selling more feed."  This assertion, that Cargill lowers the price for its own customers, is not, in itself anticompetitive.  "[C]utting prices in order to increase business often is the very essence of competition...; mistaken inferences...are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Cargill, Inc. v. Monfort of Colorado, Inc*., 479 U.S. 104 n.17 (citing *Matsushita*, 475 U.S. at 594); see also, *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp*., 113 S. Ct. 2578, 2588 (1993) (below-cost pricing is not anticompetitive in itself because, although it causes allocative inefficiency, it brings lower aggregate prices in the market).  This assertion is also very different from the assertions plead in the FACC–that Cargill *raised* prices above the product costs for anticompetitive purposes.  The Court resolves this apparent inconsistency by testing the sufficiency of the FACC rather than the argument.  Thus, while it is not proper for this Court to assume that Cargill has violated the antitrust laws in ways that have not been alleged by Progressive, *Associated General Contractors*, 459 U.S. 519, 526, it is proper to consider allegations contained in the FACC.

Progressive alleges that "for anticompetitive purposes, to interfere with [Progressive's] and their customer's ability to obtain beef blood meal, and/or to drive up [Progressive's] product costs and make them a less desirable option for their customers and other dairy farmers," Cargill purchased "essentially all" of the beef blood meal in the West Coast Region. Progressive further alleges in the FACC that Cargill purchased the "entire West Coast Region beef blood meal supply in order to corner that market...and to drive up the product cost for the feed blends and premix formulas" that Progressive has prepared for its customers. Progressive alleges that they and their customers are forced to choose between purchasing beef blood meal from Cargill or from even more costly, distant sources. Finally, Progressive alleges that by purchasing the "entire" beef blood meal supply in the West Coast Region, Cargill has eliminated alternate sources in the product and geography markets and "intentionally and artificially inflated beef blood meal costs in so doing." This conduct and intent, if true, is "inimical to competition" and falls within the Sherman Act. *See Brown Shoe Co.*, 370 U.S. 294, 313.

### b. Participant/Injury in the Same Market

The antitrust injury requirement also requires "that an injured party must be a participant in the same market as the alleged malefactors." *Am. Ad. Mgmt*. at 1055. Furthermore, 'antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained." *Ass'n of Wash. Pub. Hospital Districts v. Philip Morris Inc.*, 241 F.3d 696, 705 (9th Cir. 2001). Cargill argues that Progressive is not in the same market as Cargill, because Progressive concedes that it does not purchase, sell or produce beef blood meal or feed containing beef blood meal. Next, Cargill argues that any injury that Progressive "suffered was suffered in some other market such as the nutritional consulting market."

Cargill contends that because Progressive is neither a competitor nor a consumer in the beef blood meal market, it can not establish antitrust injury. See e.g. *Lucas*, 800 F.2d at 844 (noting that the antitrust injury requirement weighs heavily against standing because plaintiffs conceded that they were neither competitors of defendant nor consumers in the relevant market); *Eagle*, 812 F.2d at 540-41 (affirming dismissal of antitrust claim for lack of standing, noting that complainants failed to allege antitrust injury because they were neither buyers nor sellers in the relevant market and were therefore not market

participants); *Bubar*, 752 F.2d at 450 ("There is no doubt that if the plaintiffs were existing competitors...they would have standing to bring the ...action. It is the fact that they were not existing competitors at the time that creates the standing problem.). Progressive defined the market as the "beef blood meal market in the West Coast Region," but does not buy, sell or manufacture beef blood meal. Additionally, Progressive is not a direct consumer of beef blood meal.

Progressive argues that "even though Progressive does not seek to manufacture or purchase animal feed, because Progressive alleges that the effects of Cargill's discriminatory sales of beef blood meal are felt by Progressive in the loss of clients for its nutritional consulting business, Progressive has therefore alleged that it has experienced an antitrust injury." In *American Ad. Mgmt.*, the Ninth Circuit espoused that the "market participant" test does not require that the party be either a consumer or competitor. 190 F. 3d 1051, 1057-58. The Court recognized the possibly of antitrust injury to indirect purchasers, potential entrants, suppliers, licensors, and dealers. *Id.* "It is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to plaintiff." *Id*. at 1058.

Even considering the more lenient standard, Progressive's nutritional consulting business is not a participant in the beef blood meal market for antitrust injury purposes. In a passing opposition on this point, Progressive argues that it is only required to *plead* antitrust injury, without further establishing that it is participant in the alleged relevant market. Such argument ignores the longstanding antitrust standing requirement for antitrust plaintiffs.

Moreover, Progressive's injury–losing clients who seek Cargill's lower feed prices–occurs in a different market. "Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Am. Ad. Mgmt.*, 190 F.3d 1051, 1057 (9th Cir. 1999). Progressive concedes its injury is the "loss of clients for its nutritional consulting business." Therefore, the FACC does not establish antitrust injury.

**3.    Directness of Injury**

The directness inquiry requires courts to analyze "the chain of causation between [Progressive's]

injury and the alleged restraint in the market." *Am. Ad Mgmt.*, 190 F.3d at 1058. "A plaintiff who complains of an injury too remote from the alleged restraint or that is derivative of an injury suffered by a third party absent from the suit is generally unable to establish antitrust standing." *Toscano,* 201 F. Supp. at 1116-17. To determine whether an injury is "too remote" to allow recovery under the antitrust laws, a three-factor test is applied: "(1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendants wrongful conduct; and (3) whether the courts will have to adopt complicated rules of apportioning damages to obviate the risk of multiple recoveries." *Ass'n of Wash. Pub. Hospt. Dists. v. Phillip Morris, Inc.*, 241 F.3d 696 (9th Cir. 2001).

Both Cargill and Progressive identify parties in the beef blood meal market which suffer injury more direct than Progressive. Cargill argues that the alleged increase in cost of blood meal directly harms other feed manufactures, as they are the true market participants as competitors. Progressive contends that "the injury in the case at bar is considerably more direct....Here, a farmer only has to pay Cargill's higher price if the farmer stays with a non-Cargill nutritionist; if the farmer switches to Cargill exclusively for its formula and feed, then the farmer gets the benefit of the lower price." Progressive further notes that "farmers...are forced to use Cargill for both the formulation and manufacture of feed"and "Cargill has proceeded to charge higher prices to customers who buy the beef blood meal." Repeatedly, Progressive emphasizes the injury the purchaser of the dairy feed made with beef blood meal. By its own argument, Progressive concedes the indirect nature of its injury.

Here, both the competitors and the purchasers are in the better legal position to raise antitrust claims against Cargill. Thus, Progressive's injury is too remote. Further, the chain of causation–from beef blood meal to manufacturer to dairy feed to farmer to Progressive–shows that Progressive's injury is too remote. The indirect injury alleged by Progressive supports a finding that Progressive does not have antitrust standing. See *Eagle,* 812 F.2d at 541-542 (affirming dismissal of antitrust claim for lack of standing, noting that any injury suffered by complainants was derived from injury suffered by market participants); *Lucas*, 800 F.2d 839 (noting that the directness of injury factor weighed heavily against

standing because it was defendants' competitors who were much more immediate victims of the alleged wrongful acts and who would have the direct claim to antitrust damages); *Ass'n of Wash.*, 241 F.3d at 701-704 (affirming dismissal of antitrust claims for lack of standing and noting plaintiffs' injury was derivative of that of the direct victims of the alleged wrongful acts); *Toscano*, 201 F. Supp. 2d at 1119 ("while the absence of an antitrust injury in a lawsuit otherwise notable for it absence of a direct connection between plaintiff and injury is insufficient as a matter of law to establish antitrust standing.").

### 4. Antitrust Standing Conclusion

Progressive does not establish antitrust injury, because it is not a participant in the beef blood market and does not allege an injury in the beef blood market. Moreover, Progressive's injuries are indirect and other plaintiffs are in the better position to raise antitrust claims. Therefore, Progressive lacks antitrust standing for its antitrust counterclaims.

## C. Sherman Act Claims

Cargill alternatively sought to dismiss the antitrust counterclaims for failure to state a claim. Section 2 of the Sherman Act makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other persons, to monopolize any part of the trade or commerce among the several states." In Counts Four through Six, Progressive alleges that Cargill has conspired to monopolize, attempted to monopolize and monopolized the beef blood market in the West Coast Region. In Count Seven, pursuant to 15 U.S.C. §14, Progressive alleges that Cargill engages in activity which restrains trade and which tends "to create a monopoly in any line of commerce."

The offense of monopoly has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). To prevail on an attempted monopolization claim, one must establish "(1) a specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving monopoly power, and (4) antitrust injury." *Image Tech. Servs. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9th Cir. 1999) ("Kodak II")(citing *Rebel Oil Co., Inc. v. Atlantic Richfield, Co.*, 51 F.3d 1421, 1434

(9th Cir). Thus, the requirements for a claim of monopolization and attempted monopolization are similar, "differing primarily in the requisite intent and the necessary level of monopoly power." *Kodak II* at 1202.[6]

Monopoly power is the "power to control prices or exclude competition." *Rebel Oil Co., Inc. v Atlantic Richfield, Co.,* 51 F.3d 1421, 1434 (9th Cir.1995). Monopoly power may be proven through either direct or circumstantial evidence. *Id.* Cargill attacks the merits of Progressive's antitrust counterclaims on two fronts. First, Cargill argues that Progressive has not properly defined the relevant markets. Second, Cargill argues that Progressive has not pleaded the proper market share for a monopoly action. Both of these assertions challenge the sufficiency of the complaint regarding monopoly power, a common element in all of the antitrust counterclaims.

To demonstrate monopoly power by circumstantial evidence,[7] a plaintiff must: "(1) define the relevant market; (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry." *Rebel Oil*, 51 F.3d 1421, 1434 (citations omitted). Cargill argues that Progressive's Sherman Act counterclaims must be dismissed because (1) Progressive has failed to define the relevant market and (2) Progressive has failed to show that Cargill has a dominant share of the market.

### 1. Defining Relevant Markets

The relevant market is the field in which meaningful competition is said to exist. *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997). Generally, the relevant market is defined in terms of product and geography. Without a proper definition of the relevant market, it is impossible to determine a party's influence over that market. *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc*., 875 F.2d 1369, 1374 (9th Cir. 1989). Although both parties argue over the definition of the relevant markets, "defining the relevant market is a factual inquiry ordinarily reserved for the jury." *Oltz*

---

[6] Cargill does not address elements of the conspiracy to monopolize counterclaim or the restraint of trade counterclaim other than those common to the monopolization claim.

[7] Although Progressive alleges that Cargill purchased up "all" or "essentially all" of the beef blood meal, they do not argue that they have direct evidence of monopoly power. Thus, the issue is whether Progressive can properly allege monopoly power through circumstantial evidence.

11

*v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988). Questions pertaining to proper market definitions are best answered after the benefit of discovery. Therefore, these arguments are premature. In the FACC, Progressive has identified a geographic and product market. Accepting all allegations to be true, a motion to dismiss is not warranted based on this argument.

### 2. Market Share

Cargill argues that the antitrust counterclaims should be dismissed because Progressive has failed to establish that Cargill has sufficient market share for the alleged monopoly power. In the FACC, Progressive contends that Cargill purchases "all" or "essentially all" or "much if not all" of the beef blood meal in the West Coast Region. Like the relevant market, market share is a question of fact; however, pursuant to *Twombly*, this Court "must retain the power to insist upon some specificity in pleading" to ensure allegations are plausible. The allegations are "labels and conclusions, and a formulaic recitation of the elements of a cause of action" which " will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1966 (2007). Progressive must assert facts in support of these conclusions in order to satisfy the "plausibility" requirement. Therefore, Cargill's motion to dismiss on this ground is granted with leave to amend.[8]

## C.   Leave to Amend

Pursuant to Fed. R. Civ. P. 15(a), leave to amend is to be "freely granted" and may only be denied if the court determines that "allegations of other facts consistent with the challenged pleading could not possibly cure the defect." *Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc*., 806 F.2d 1393, 1401 (9th Cir. 1986). Progressive requested leave to amend the allegations, and it is possible to cure the defects identified in this order. Accordingly, Progressive's request for leave to amend is GRANTED.

### IV. CONCLUSION

For the foregoing reasons, this Court:

---

[8] Because the Court finds Progressive's claims insufficient regarding the allegations of market share, an element common to all causes of action, the Court does not reach the arguments relating to the dangerous probability of success, which is specific to the attempt claim.

1. GRANTS with LEAVE TO AMEND Cargill's motion to dismiss Progressive's antitrust counterclaims based on Progressive's lack of antitrust standing;

2. GRANTS with LEAVE TO AMEND Cargill's motion to dismiss Progressive's antitrust claims based on Progressive's failure to state a claim of sufficient monopoly power market share;

3. DENIES Cargill's motion to dismiss Progressive's antitrust counterclaims based on Progressive's failure to state a claim of the relevant markets; and

4. ORDERS Progressive to file a second amended counterclaim on or before September 18, 2007.

IT IS SO ORDERED.

**Dated:   August 30, 2007**                         /s/ Lawrence J. O'Neill
                                            UNITED STATES DISTRICT JUDGE