1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

9   CARGILL INC. AND CAN                    CASE NO. CV-F-07-0349- LJO-SMS
    TECHNOLOGIES, INC.,
10
                Plaintiffs,                 **ORDER ON CARGILL'S MOTION FOR**
11                                          **SUMMARY JUDGMENT ON CERTAIN**
                                            **COUNTERCLAIMS**   (Doc. 177)
12          vs.

13
    PROGRESSIVE DAIRY
14  SOLUTIONS, INC. *et al.*,

15              Defendants.
    _____/
16

17  and related counterclaims.

18  _____/

19          By notice on April 4, 2008, Plaintiffs and counterclaim defendants Cargill Inc. and CAN

20  Technologies ("CAN") (collectively "Cargill") move for summary judgment of defendants' and

21  counterclaim plaintiffs'[1] counterclaims related to alleged defamatory communications and alleged unfair

22  business practices and fraudulent conduct.  Progressive opposed this motion on April 24, 2008.  Cargill

23  replied to Progressive's opposition on May 1, 2008.  By order of this Court, Progressive filed a sur-reply

24  on May 13, 2008.  Having considered the parties' memoranda and  documents, and for the following

25  reasons, this Court GRANTS in part and DENIES in part Cargill's motion for summary judgment.

26  _____

27          [1]Defendants are Progressive Dairy Solutions, Inc. ("Progressive Dairy Solutions"), Matthew Budine ("Mr. Budine"),
    Luciana Jonkman ("Ms. Jonkman"), and Brian Sundberg ("Mr. Sundberg") (collectively "Progressive") (individual
28  defendants collectively referred to as "Progressive Defendants").

                                            1

## II. BACKGROUND

## A. Introduction

Cargill, Inc. manufactures feed for dairy herds.  Cargill Animal Nutrition ("CAN"),  a division of Cargill, Inc., provides dairy feed formulation services to customers who buy Cargill Inc.'s manufactured feed.  The Progressive Defendants are former CAN employees. Mr. Budine was the General Manager of CAN's Pacific Coast region, while Mr. Sundberg and Ms. Jonkman were dairy management consultants and nutritionists under Mr. Budine's management.

On January 31, 2007, the Progressive Defendants left Cargill to form Progressive Dairy Solutions.  Progressive Dairy Solutions provides nutritional consulting services to dairy farmers.  Like CAN, Progressive Dairy Solutions creates custom feed formulations designed to maximize overall animal health, milk production, reproduction and growth.  Progressive Dairy Solutions does not manufacture feed.  Rather, it bids out its feed formulations to feed manufacturers for production to one or more feed manufacturers, including Cargill, Inc.

On March 1, 2008, Cargill filed the instant action.  Cargill asserts fourteen claims against Progressive Dairy Solutions and the individual Progressive Defendants, including misappropriation of trade secrets, breach of contract, unfair competition, intentional interference with prospective economic advantage, defamation, civil conspiracy, and breach of the duty of loyalty.

In response, Progressive filed its counterclaim against Cargill.  Cargill moves for summary judgment on the following causes of action:

    1.    Latham Act Section 43 (a), 15 U.S.C. §1125(a), Unfair Competition;
    2.    Common Law Unfair Competition;
    3.    Statutory Unfair Competition, Cal. Prof. & Bus. Code §§17200;
    8.    Unfair Trade Practices, Cal. Bus. & Prof. Code §17000 *et seq*.;
    9.    Business Disparagement/False Advertising, Cal. Bus. & Prof. Code §17500
    10.    Defamation/Commercial Disparagement;
    11.    Intentional Interference with Contractual Relations;
    12.    Intentional Interference with Prospective Business Relations;
    13.    Fraud;
    18.    Unjust Enrichment; and
    19.    Civil Conspiracy[2]

---

[2]On May 6, 2008, Progressive stipulated to dismiss Counts 4-7 (Conspiracy to Tie, Attempted Tying, Tying, and Attempted Monopolization).  (Doc. 263).  Cargill did not move for summary judgment on Counts 14-17 (nonpayment of wages, breach of contract (employment agreement), breach of implied covenant of good faith and fair dealing, and breach

1   Progressive's tort and unfair competition counterclaims are based on its theory that Cargill

2   engaged in defamatory conduct and communications that were specifically designed to retaliate against

3   the Progressive Defendants and destroy Progressive's efforts to be a fair Cargill competitor in the

4   marketplace.  Progressive alleges that Cargill engaged in a number of defamatory statements and unfair

5   business practices and and fraudulent business practices.  A brief background of the alleged defamatory

6   communications and conduct, unfair business practices and fraudulent business practices is provided

7   below.

8   **1.      Alleged Defamatory Statements and Conduct**

9   Progressive alleges defamatory statements in two contexts: (1) filing and publicizing the current

10  lawsuit and (2) statements made by Cargill employees about Progressive and Progressive Defendants.

11  **a.      Statements Made In the Context of Litigation**

12  Progressive alleges that Cargill's complaint against Progressive is defamatory.  Additionally,

13  Progressive argues that Cargill publicized the lawsuit to defame Progressive and Progressive Defendants.

14  Cargill filed its complaint in this matter against Progressive and the Progressive Defendants on March

15  1, 2007.  On the same day, the Court granted Cargill's *ex parte* motion for a temporary restraining order.

16  The March 2, 2008 Amended Temporary Restraining Order prevented the Progressive Defendants from

17  destroying evidence and required imaging of Progressive's electronic media (*See* Doc. 15).  At the time

18  the temporary restraining order was served on the Progressive Defendants, Mr. Budine was at a

19  convention for the dairy nutrition industry.  Many participants witnessed the United States Marshall serve

20  Mr. Budine with the temporary restraining order and were aware that Progressive's computers were

21  ordered to be seized.

22  On March 6, 2007, Cargill posted the following news release on its website[3]:

23  **Cargill files legal action against former employees**

24  Stockton, Calif.–Cargill filed a lawsuit in federal district court in Sacramento on March
    1 against the former general manager of its Pacific Coast business and four of its former
25  dairy consultants, all of whom resigned on Jan. 31 from Cargill to start two dairy

26  ─────────────────

27  of contract (non-disclosure agreement)).

28  [3]This news release was posted at http://www.cargill.com/news/news_releases/2007/070306_canlgal.htm#TopOfPage
    but is no longer posted online.

consulting businesses. The <u>lawsuit</u>[4] follows a Cargill investigation into the circumstances surrounding their departure and alleges misappropriation of trade secrets, breach of contract, unfair competition and defamation, among other legal claims.

"It's unfortunate that we had to take this action," said Cargill Animal Nutrition President Todd Hall.   "However, Cargill's commitment to our customers requires that we vigorously protect our trade secrets and other confidential and proprietary information."

Hall cited Cargill Animal Nutrition's long established and ongoing practice of making significant investments in new animal nutrition technologies that have enabled Cargill to provide demonstrated value to dairy customers.  "We are dedicated to continuing this innovation, but it is only by protecting our technology that we will be able to do so."

Hall further added that Cargill Animal Nutrition's longstanding emphasis around its core values–integrity, respect for others, commitment to serve and passion for success–shapes the way Cargill Animal Nutrition and its employees conduct business.  "These values guide our actions, and they will remain core to how we work in serving our customers."

Along with posting this news release on its website, Cargill emailed the news release to media outlets[5] to "ensure the facts of the actions [Cargill] has taken are addressed in the appropriate way." (Declaration of Michael Marderosian ("Marderosian Decl."), Ex. 24, Todd Hall email to CAN general managers).

In response to questions related to this action, CAN president Todd Hall sent the following email message:

This message responds to your phone call to me and your email sent to Cargill on March 7, 2007.  We appreciate your taking the time to let us know your thoughts about this matter.  You should know that Cargill does not take lightly the decision to file a lawsuit, and the lawsuit was filed after an extensive investigation.  Cargill takes seriously, however, the protection of its intellectual property and proprietary information, and will take the necessary steps to ensure that protection.  It is important for us to understand your views and questions, and we welcome the opportunity to provide you with accurate information about the legal action Cargill is pursuing with respect to this matter.  For this reason, we direct you to Cargill's recently issued press release, which is available at HYPERLINK "http://www.cargill.com/news/news_releases/current_year.htm."[6]

During the pendency of this litigation, one corporate and two individual defendants, Diversified Dairy Solutions, Inc., Todd Schwegel ("Mr. Schwegel") and Douglas DeGroff ("Mr. DeGroff"), settled

---

[4]The word "lawsuit" contained a hyperlink that, if clicked, would direct the reader to view Cargill's complaint filed against Progressive on March 1, 2008.

[5] Although "not on the list" of media outlet to which Cargill sent the news release, FeedInfo News Service published the news release on its website at http://www.feedinfo.com/console/PageViewer.aspx?page=529752&print=yes on September 3, 2007.

[6]This email was sent unchanged (except for the date of the inquiry) to three people.  Marderosian Decl., Ex. 21.

1   this action with Cargill**.**

2       **b.     Statements Made by Cargill Employees**

3       After Cargill filed the lawsuit, Cargill employees made statements about Progressive to each

4   other, Cargill clients, existing Progressive clients, and prospective Progressive clients.  While Progressive

5   alleges that Cargill employees made a number of defamatory statements, the evidence supports

6   Progressive's allegations that Cargill employees made the follow statments:

7   • Mr. Sundberg overcharges his customers, "skimmed off the top" money from each ton he sold,
        had the second highest margin in the company, and overspent Cargill's money on clients.
8   • In referring to the instant lawsuit, a Cargill employee stated: "Cargill doesn't just sue anybody."
    • Progressive founders were "bad" people and were putting hundreds of families out of jobs in
9        California.

10  **2.     Alleged Unfair Business Practices**

11      Progressive alleges further that Cargill engaged in a course of conduct calculated to harm

12  Progressive, which includes: (1) failing to conduct significant investigation prior to filing the lawsuit and

13  temporary restraining order; (2) failing to provide the Progressive Defendants with an exit interview; (3)

14  refusing to settle this lawsuit with Progressive; (4) boycotting Progressive Dairy Solutions and their

15  customers without a legitimate business purpose; and (5) misappropriating and misusing Progressive's

16  premix.

17  **3.     Alleged Fraud**

18      While the Progressive Defendants worked at CAN, dairy farmers in Louisiana initiated a class

19  action lawsuit against Cargill. *John Burford et al. v. Cargill, Inc.*, Civil Action No. 05-0283 (W.D. LA.)

20  ("the *Burford* action").  In that lawsuit, dairy farmers allege that after representing to dairy farmers that

21  it was selling them specific feed formulations, Cargill, without notice to farmers, changed the feed

22  formulation to utilize cheaper ingredients that do not provide equivalent nutrition.  The Progressive

23  Defendants allege that when they asked Cargill for reassurances that the allegations were untrue, Cargill

24  denied the allegations contained in the Burford action.  The Progressive Defendants alleged that they

25  relied on Cargill's denials, and assured their customers that the allegations were untrue.  Now,

26  Progressive argues that the Progressive Defendants' reputations in the community are damaged because

27  of the reassurances they gave to their clients that the *Burford* allegations were false.  The *Burford* action

28  is ongoing.

### III.  Standard of Review

Cargill moves for summary judgment of Progressive Counterclaims 1-3, 8-13, and 18-19.[7]  On summary judgment, a court must decide whether there is a "genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing of sufficient evidence to establish an essential element of the nonmoving party's claim, and on which the non-moving party bears the burden of proof at trial.  *Id.* at 322.  "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

If the moving party fails to discharge its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes*, 398 U.S. 144, 159-60.  "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quoting Fed. R. Civ. P. 56(e)).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968) *T.W. Elec. Serv.*, 809 F.2d at 631.  The opposing party "must do more than simply show that there is some metaphysical doubt as to the material

---

[7]  In the alternative, Cargill moves for summary adjudication.  Pursuant to Fed. R. Civ. P. 56(d), "summary adjudication of only some of the claims imposes a duty on the trial court to 'if practicable' articulate what facts are established and which remain controverted." *Hampton v. Dillard Dept. Stores, Inc.*, 247 F.3d 1091 (10th Cir. 2001), *cert. denied*, 534 U.S. 1131 (2002).

facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by depositions, answer to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted). When making this determination, the opposing party's evidence is to be believed and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255;

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically references therein." *T.W. Elec. Serv.*, 809 F.2d at 630. The Court is not obliged "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1).

## IV. DISCUSSION

### A. Claims Related to Alleged Defamatory Communications

Progressive based the following claims on alleged defamatory communications and conduct: (1) defamation (count 10), (2) intentional interference with contractual relations (count 11), (3) intentional interference with prospective business relations (count 12), (4) Latham Act Section 43(a) (count 1), and (5) False Advertising, Cal. Bus. & Prof. Code Section 17500 (count 9).

### 1. Defenses to All Claims Based on Alleged Defamatory Communications

As noted above, five of Progressive's claims rely on alleged communications related to this litigation or made by Cargill employees. Cargill argues that summary judgment is appropriate for each of Progressive's claims based on the alleged defamatory statements and conduct, because they are protected by the litigation privilege or are new allegations raised for the first time in opposition to this motion which are untimely, unsupported by admissible evidence, or unsupported by the evidentiary record. This Court first addresses Cargill's privilege and admissibility arguments, as resolution of these arguments will determine what statements, if any, the Court will consider in each of Progressive's five

1   claims based on the alleged defamatory communications.

2           **a.      Statements Made Within the Context of Litigation**

3           Cargill argues that summary judgment should be granted its favor to the extent that Progressive's

4   tort and unfair competition claims rely on statements protected by the litigation privilege.  Progressive

5   alleges that Cargill's complaint is defamatory, because Cargill knew, or now knows, that Progressive

6   misappropriated no legally protectable trade secrets, and therefore "by filing and prosecuting the current

7   lawsuit," Cargill made false representations about Progressive to the public, including current and

8   prospective customers.  Progressive argues that Cargill "exceeded the breadth of the litigation privilege"

9   because it acted with malice, "engaged in an active and meticulous campaign bombarding third parties

10  with information regarding the lawsuit" and "actively and aggressively sought out customers and potential

11  customers to advise them about the lawsuit."

12          The litigation privilege bars claims based on "any publication required or permitted by law in the

13  course of a judicial proceeding to achieve the objects of the litigation, even though the publication is

14  made outside a courtroom and no function of the court or its officers is involved." *Silberg v. Anderson*,

15  50 Cal. 3d 205, 212 (1990).  "The usual formulation is that the privilege applies to any communication:

16  (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law;

17  (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the

18  action." *Id.*

19          Progressive's claims based on the alleged defamatory communications related to this action are

20  barred by the litigation privilege to the extent they rely on privileged communications.  The purpose of

21  California's litigation privilege is to "protect a litigant's right to access to the courts without fearing

22  subsequent, harassing derivative tort actions." *Rohde v. Wolf*, 154 Cal. App. 4th 28, 37-38 (2007).  For

23  this reason, the privilege is "broadly construed." *Id*.  The litigation privilege bars all tort causes of action

24  except a claim for malicious prosecution." *Id.* at 38.[8]   Moreover, the litigation privilege applies

25  _____

26          [8]Progressive ostensibly rests its defamation and unfair competition claims on communications and conduct related
    to the instant action.  Progressive argues that Cargill exceeded the litigation privilege, because Cargill acted with malice.
27  Progressive's arguments, however, attempt to state a claim for malicious prosecution, which is an exception to the litigation
    privilege.  In order to establish a cause of action for malicious prosecution, Progressive must demonstrate that the prior action
28  (1) was commenced by or at the direction of Cargill and was pursued to legal determination in Progressive's favor; (2) was

notwithstanding a party's attempt to "plead around" this "absolute barrier." *Rubin v. Green*, 4 Cal. 4th 1187, 1193 (1993) (*e.g.*, defamation and unfair competition). The litigation privilege has been described as "absolute, regardless of malice and extending even to perjury."[9] *Jacob B. v. County of Shasta*, 40 Cal. 4th 948, 956 (2007). Therefore, Progressive's tort claims fails as a matter of law to the extent that they are predicated on the alleged defamatory statements Cargill made within the context of this litigation. Those statements include the following:

### 1.   Cargill's Complaint

Cargill's complaint in this action, and the statements made in its complaint, are protected by the litigation privilege. This includes the copy of the complaint made available on Cargill's website. Cargill's motivation for filing the complaint is inapposite. As noted above, the litigation privilege is absolute, regardless of malice. *Jacob B.*, 40 Cal. 4th 948, 956.

### 2.   News Release

Although not all publicity falls within the litigation privilege, communications "merely informing a third party of the pendency of the litigation" are within the scope of the privilege. *eCash Tech., Inc. v. Guagliardo*, 127 F.Supp.2d 1138 (C.D. Cal. 2000) (letter informing third party that trademark suit had been filed was privileged); *see also*, *Designing Health, Inc. v Erasmus,* 2001 U.S. Dist. LEXIS 25952, 12-13 (C.D. Cal. 2001) (letter and news release to consumer and trade publications and distributors announcing suit for misappropriation of trade secrets and other claims were protected by the litigation privilege "because they simply informed the recipients of the pendency of the litigation and the claims asserted"). The news release posted on Cargill's website, and distributed to media outlets fall within the

---

brought without probable cause; and (3) was initiated with malice. *Merlet v. Rizzo*, 64 Cal. App. 4th 53, 58 (1998). Here, Progressive can not demonstrate that there was a legal determination in Progressive's favor. Indeed, Cargill's claims against Progressive continue to be litigated in this action. Progressive did not seek summary judgment on any of Cargill's claims. "The reason the courts have held that a malicious prosecution action cannot be grounded upon actions taken within pending litigation is that permitting such a cause of action would disrupt the ongoing lawsuit by injecting tort claims against the parties' lawyers and because the appropriate remedy for actions taken within a lawsuit lies in the invocation of the court's broad powers to control judicial proceedings." *Adams v. Superior Court*, 2 Cal App. 4th 521, 528 (1992). Therefore, Progressive's claims are more appropriately raised *after* the pending litigation is resolved, if at all.

[9] Thus, Progressive's allegations of malicious conduct in litigating this lawsuit are irrelevant. Those charges include: (1) Cargill did not issue a cease and desist letter before filing the lawsuit; (2) Cargill refused to perform an exit interview at the Progressive Defendant's request; and (3) Cargill made no effort to settle the claims with Progressive Defendants, even though they settled with the other defendants.

1   litigation privilege.  In the news release, Cargill states the basic facts about this lawsuit (i.e., where and

2   when Cargill filed the lawsuit).

3          The news release is non-actionable for the additional reason that it is true, protected speech.  The

4   right to speak freely and truthfully about a subject, including judicial proceedings, is closely guarded by

5   both the U.S. and California Constitutions.  *See, e.g., Hurvitz v. Hoefflin*, 84 Cal. App. 1232, 1241 (2000).

6   In defamation cases, "the truth of the offensive statements or communication is a complete defense

7   against civil liability, regardless of bad faith or malicious purpose." *Smith v. Maldonado,* 72 Cal. App.

8   4th 637, 646 (1999).  Accordingly, communications truthfully informing the recipients about ongoing

9   litigation is not defamatory. *eCash Techs., Inc.v. Guagliardo*, 127 F. Supp.2d 1069, 1082 (C.D. Cal.

10  2000).  This is true even if these communications create a "buzz," or reach an audience greater than

11  intended.  "Nonactionable communications do not expose the speaker to liability because they are likely

12  to reach a greater number of recipients." *Gilbert v. Sykes*, 147 Cal. App.4th  13, 34 (2007).

13                          **3.    Todd Hall emails**

14         Similarly, the emails from Todd Hall fall within the litigation privilege.  The emails were

15  communications made in response to customer inquiries about the instant action.  The emails refer

16  inquirers to the news release.  These statements are protected.  *See Franklin v. Dynamic Details, Inc*., 116

17  Cal. App. 4th 375 (2004) (emails about lawsuit not actionable as trade libel or libel).

18                    **4.    Settlement agreements with Doug DeGroff and Todd Schwegel**

19         Progressive submits that the settlement agreement negotiations, settlement agreements, and letters

20  sent by Mr. DeGroff and Mr. Schwegel are defamatory.  Progressive argues that certain provisions of the

21  settlement agreements are intended to "condemn" Progressive and to "harm" the reputations of the

22  Progressive Defendants.[10]    Settlement negotiations and confidential settlement agreements are

23  communications calculated "to achieve the objects of the litigation." *Asia Investment Co. v. Borowski*,

24  133 Cal. App. 3d 832 (1982).  Therefore, these statements are privileged.

25                          **5.    Defamatory Conduct**

26         Progressive argues that Cargill's actions are not protected by the litigation privilege, because the

27

28         [10]  This claim fails for the additional reason that the settlement agreements are confidential.  Thus, there was no
       publication, as required by a defamation claim.  *See Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999).

1 litigation privilege does not portect "tortious courses of conduct." *Kupiec v. American Int'l Adjustment*

2 *Co.*, 235 Cal. App. 3d 1326, 1331 (1991). Progressive alleges that Cargill's execution of the temporary

3 restraining order unprivileged defamatory conduct, because Cargill executed the temporary restraining

4 order on Mr. Budine in public to humiliate him intentionally in front of the dairy nutrition industry.

5      The execution of the temporary restraining order was made by a United States Marshall, who

6 carried out an order of the United States District Court. (Doc. 15). Therefore, the execution is not an

7 action by Cargill and, thus, Cargill cannot be liable for those actions. Moreover, while the litigation

8 privilege does not apply to tortious courses of conduct, it applies to communicative acts. *Kupiec*, 235

9 Cal. App. 3d at 1331. Progressive's claims "however styled, are founded upon utterance of injurious

10 communications made in or in connection to [this] action. [Cargill] cannot be liable without reliance on

11 privileged communications made in the course of a judicial proceeding." *Id.* at 1331. Thus, the execution

12 of the temporary restraining order was a communicative act related to the judicial proceedings.

13 Accordingly, this act falls within the litigation privilege.

14      **b.      Statements Made by Cargill Employees**

15      Progressive alleges that Cargill employees made several defamatory statements in a variety of

16 settings which caused harm to their reputation, interfered with contracts and existing contracts, and

17 constitute unfair competition. The Court first considers whether Progressive has submitted sufficient

18 evidence to raise issues of fact as to the alleged defamatory statements.

19      **1.      Absence of Evidence**

20      "When a motion for summary judgment is properly made and supported, an opposing party may

21 not rely merely on allegations or denials in its own pleading; rather its response must...set out facts

22 showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The following allegations by Progressive

23 are bald assertions, with no citation to the evidentiary record and no evidence to support them. In these

24 statements, Progressive failed to demonstrate sufficient evidence "that a reasonable jury could return a

25 verdict for the nonmoving party" on these claims and summary adjudication is appropriate. *Anderson,*

26 477 U.S. at 248.

27      First, Progressive alleges that Cargill employees stated that Progressive is making "a lot of money

28 off their premix." Interrogatory Response 7. In opposition, Progressive fails to cite to the evidentiary

record to support its position that a Cargill employee made this statement.  In a footnote, Progressive implies this statement was made to Mr. Pires, Mr. Kooyman, and Mr. Vitoria.  There is no evidence this statement was made to by a Cargill employee to anyone, including Mr. Pires, Mr. Kooyman, or Mr. Vitoria. (*See* Transcript testimony of Pires and Kooyman, and Vitoria Declaration).

Second, Progressive argues that "Cargill employees repeatedly told customers and potential customers that they intended to put Progressive out of business, that Cargill will make it extremely difficult for Progressive to compete, and that they intend to squash or crush Progressive." Opposition, 15. Progressive cites no evidence that a Cargill employee made any of these statements.[11]

Third, Progressive alleges that Cargill employees told Dave Koolhaas, current Progressive Dairy Solutions customer,  that "Sundberg was overcharging them while he was an employee at Cargill and 'skimming $10/ton of feed off the top for himself.'" (Interrogatory Response 7).  Mr. Koolhaas declared that neither Joey Van Vliet or Michael Oliveira, Cargill employees, "ever made any statement to me that I understood to mean Brian Sundberg was 'overcharging while he was an employee at Cargill,' or was 'skimming $10/ton of feed off the top for himself." Koolhaas Decl., ¶7.  Mr. Koolhaas declared further that neither Mr. Van Vliet nor Mr. Olivera "made any negative statements about Brian Sundberg, Luciana Jonkman, Matt Budine, or Progressive Dairy Solutions, Inc. to me."  Mr. Koolhaas declared that "No Cargill employee ever made any statement that...Sundberg had the second highest margin in the company while at Cargill."  Progressive does not dispute that Mr. Koolhaas denies these statements were made to him and do not point to any admissible evidence that materially contradicts it.

Fourth, Progressive alleges that one Cargill employee told another Cargill employee that Mr. Sundberg was aware that a former employee had raped his stepdaughter.  (Interrogatory Response).  In support of this claim, Progressive cites to three declarations, however none of those declarations supports this claim.  Therefore, there is no evidence in the record to support his claim.

Progressive failed to provide evidence to support these statements.  Accordingly, summary adjudication is appropriate. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.

---

[11] In untimely declarations, discussed *infra*, Cargill competitors and Progressive customers opine that Cargill can squash Progressive Dairy Solutions.  However, there is no evidence that a Cargill employee made these statements.  One person "heard that Cargill was going to squash Progressive Dairy Solutions."  However, this untimely declaration relies on inadmissible hearsay and does not attribute the statement to a Cargill employee.

### 2.   Inadmissible Evidence

As to the alleged defamatory statements, Progressive further rests its claims on inadmissible evidence. In order to rebut Cargill's motion for summary judgment, Progressive must provide an "opposing affidavit [] made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). The Court addresses the inadmissibility of the evidence below.

### i.   Declarations

In opposition to the instant motion, Progressive submitted, *inter alia*, 16 declarations signed and dated between April 19-24, 2008 (Docs. 188-203) (collectively referred to as "declarations"). The declarations are signed by the Progressive Defendants, dairy nutritionists, and dairy farmers. Cargill objects to Progressive's reliance on the declarations and moves to strike them as a sanction for discovery obligation violations. Cargill argues that Progressive never disclosed previously the information contained in the declarations.

Cargill argues that the information in the declarations should have been disclosed pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii) or (e)(1) as information a party "may use to support its claims." This Court ordered Progressive to address Cargill's timeliness arguments. (Order for Additional Briefing, May 6, 2008, Doc. 264). In its sur-reply, Progressive largely ignored Cargill's assertion, and this Court's concern, that the declarations were untimely. In a footnote, Progressive briefly mentions the declarations and asserts that even if this evidence is "new, information obtained by investigation or other means outside formal discovery, even if obtained after the 'cut off' date, may nonetheless be admissible at trial." Progressive Sur-reply, 3 n.1 (citing *Los Angeles News Service v. CBS Broadcasting, Inc.*, 2002 U.S. App. Lexis 26210 (9th Cir. 2002)). The unpublished opinion upon which Progressive relies is distinguishable, in that the court specifically noted that discovery sanctions were inappropriate because the district court had not adopted Fed. R. Civ. P. 26. *Los Angeles News Service*, 2002 U.S. App. Lexis 26210.

This Court strictly enforces the Federal Rules of Civil Procedure related to discovery. Fed. R. Civ. P. 26(e) requires litigants to "seasonably" supplement all interrogatory responses if their prior responses are either incomplete or incorrect. Fed. R. Civ. P. 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(e)(2)...shall not, unless such a

1  failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or

2  information not so disclosed."  "Rule 37 gives teeth to these requirements by forbidding the use at trial

3  of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly,*

4  *Ltd. v. Deckers Outdoor Corp.* 259 F.3d 1101, 1106 (9th Cir. 2001).  Fed. R. Civ. P. 37 provides two

5  exceptions to automatic exclusion.  "The information may be introduced if the parties' failure to disclose

6  the required information is substantially justified or harmless." *Id.*

7        Neither exception applies.  Progressive provides no justification for its failure to supplement its

8  discovery responses.  Progressive states that "it was simply unknown by Progressive until the time that

9  Cargill filed its motion that Cargill had made the same defamatory comments to these individuals that

10  it had made to others."  However, Progressive does not explain why it failed to investigate its case, for

11  which it bears the ultimate burden of proof at trial, months after the fact discovery cut-off.  Moreover,

12  Progressive provides no explanation as to why the information was unavailable previously.  Additionally,

13  the failure to disclose is not harmless to Cargill.  Fact discovery closed on February 15, 2008.  Cargill

14  has not had the opportunity to depose the multiple witnesses with material information that Progressive

15  revealed only in opposition to this motion.

16        Progressive may not submit declarations containing previously undisclosed information in

17  opposition to a summary judgment motion to raise triable issues of fact.  *Cambridge Elecs. v. MGA*

18  *Elecs., Inc.*, 227 F.R.D. 313, 323 (C.D. Cal. 2004); *see also, Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999,

19  1005 (9th Cir. 2002) (if failure to disclose information pursuant to Fed. R. Civ. P. 26(e)(1) causes unfair

20  surprise or prejudice, the district court properly bars its use at summary judgment).  Accordingly, this

21  Court strikes the declarations for violation of discovery obligations pursuant to Fed. R. Civ. P. 37 for

22  failure to disclose the statements or to supplement the interrogatory responses pursuant to Fed. R. Civ.

23  P. 26(a)(1)(A)(ii) or (e)(1) to the extent that the information violates Fed. R. Civ. P. 26.

24        **ii.       Hearsay and Lack of Foundation**

25        The Court may refuse to consider evidence that does not conform with the requirements of Fed.

26  R. Civ. P. 56.  "A supporting or opposing affidavit must be made on personal knowledge, set out facts

27  that would be admissible in evidence, and show that the affiant is competent to testify on the matters

28  stated." Fed. R. Civ. P. 56(e)(1).  The following evidence submitted by Progressive relies on inadmissible

hearsay and/or do not demonstrate that the affiant is competent to testify to the matters stated.  For these reasons, this Court will not consider this evidence.

First, Mr. Budine testified that Jack Hamm ("Mr. Hamm"), a Progressive Dairy customer, told Mr. Budine that Mr. Hamm was told by someone that Mr. Sundberg was "skimming off the top" and "jok[ed] how ridiculous that comment was" and that Mr. Hamm "was smart enough not to believe it." Budine 11/6/07 Tr., 591:13-593:6.  Mr. Budine admits that this statement was ridiculous and not believed. Mr. Budine lacks personal knowledge of any conversations Mr. Hamm had with a Cargill employee. Therefore, this is inadmissible hearsay and will not be considered on summary judgment.

Second, Progressive alleges that a Cargill employee told a potential Progressive customers at Holmestead Dairy that "if [the dairymen] only knew what these guys would have done–or if you only knew what these guys did, you would not be doing business with them."  The evidence submitted in support of this allegation is Mr. Sundberg's deposition testimony that people from Holmestead Dairy told him what the Cargill employee told the people at Holmestead dairy.  Mr. Sundburg's testified that after making this statement, the person at the Holmestead Dairy told him that the Cargill employee immediately drove away but then called the dairyman back 15 minutes later to apologize.  According to Mr. Sundberg, the dairyman told Mr. Sundberg that the Cargill employee said that "I never should have said that, you know, I'm-just-angry-type response." Sundberg Tr., 484.  Mr. Sundberg lacks foundation to testify to this conversation and his testimony is hearsay.

For the two allegations above, Progressive submits evidence which is not made on personable knowledge.  This evidence is insufficient to raise a triable issue of fact, pursuant to Fed. R. Civ. P. 56(e)(1).  Accordingly, summary adjudication is appropriate.

**2.      Defamation/Commercial Disparagement**

Progressive submitted admissible evidence of statements which the Court now considers. Defamation is "an invasion of the interest in reputation." *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999).  Defamation is defined as an intentional publication of a  statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damages.  *Id.*  Slander is a "false and unprivileged publication...which...tends directly to injure [a person] in respect to his [or her]...profession, trade or business, either by imputing to him [or her] general disqualification in those

15

respects in which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits." Cal. Civ. Code. §46.

Whether a statement is defamatory can be reached as a matter of law. *Okun v. Superior Court*, 29 Cal.3d 442, 449-50, *cert. denied*, 454 U.S. 1099 (1980). If the material complained of is not fairly susceptible of a defamatory meaning, it is proper to dismiss the action." *Polygram Records v. Superior Court*, 170 Cal. App. 543, 551 (1985). "If the language is capable of two meanings, one harmless and one defamatory, it is the province of the trier of fact to determine in which sense the language was used and understood." *Id.* (citing *Arno v. Stewart*, 245 Cal. App. 2d 955, 960 (1966). The threshold inquiry is simply whether the communication in question could reasonably be understood in a defamatory sense by those who received it." *Id.*

### a.    Statements of Opinion

An opinion that does not convey a false factual implication is not defamatory under California Law. *Kahn v. Bower*, 232 Cal. App. 3d 1599, 1607 (1991). Progressive alleges that Cargill employees told former Cargill and Progressive clients that the Progressive Defendants were "bad people" and "putting hundreds of families out of jobs in California." Statements that a Progressive Defendant is "bad" are not defamatory, as it is a statement of opinion that is not provable false. *Weller v. ABC*, 232 Cal. App. 3d 991, 1000 (1991). This includes Progressive's allegation that Cargill Vice-President Chuck Warta told a group of Cargill employees that Mr. Budine was "selfish," "not a team player," and "caused the demise of the business." This further includes the allegation that a Cargill employee used an offensive word to describe the Progressive Defendants to Richie Heida.

### b.    Statements with Unresolved Questions of Fact

Progressive has raised issues of material fact in the following statements, because they are susceptible to a defamatory meaning. For these statements, Cargill argues that the statements are not defamatory, because the words were outrageous or "business puffery," or caused no damage since the statements had no effect on the listener (i.e., the listener continued to employ Progressive Dairy Solutions). The Court notes that "it is not necessary that anyone believe the [] words in order for them to be defamatory, since the fact that such words are in circulation at all concerning the plaintiff must be

to some extent injurious to his reputation–although obviously the absence of belief will bear upon the amount of damages." *Polygram Records*, 170 Cal. App. 3d 543, 555.  Here, the damages are a question of fact.

The first statement which raises an issue of fact is Progressive's allegation that Cargill employees told dairy customer Tony Pires that "Sunderberg was overcharging them while he was an employee at Cargill and 'skimming $10/ton of feed off the top for himself.'"  Mr. Pires does not recall being told that Sundberg was skimming.  Rather, Mr. Piers said that he was told by Mr. Oliveira, a Cargill employee, that Mr. Sundberg had "his own personal margin, he set it himself.  It wasn't Cargill that told him that's how much he had to put on" and that Mr. Sundberg had his "own high personal margin." Pires Tr. at 45:3-11. Mr. Pires testified that he took the comments he heard about Mr. Sundberg's alleged margin as "an attempt to persuade me not to go with Mr. Sundberg." Pires Tr., 92:23-93:6.  Moreover, Mr. Pires "wasn't so much offended as amused" by the effort.  Mr. Pires further testified that he "never really believed" that Mr. Sundberg was taking advantage of him and that Mr. Oliveira's effort to persuade him not to deal with Mr. Sundberg "didn't work" and did not "ever in any way affect [him] on what [he was] going to do with [his] feed or formula." Pires Tr. 52:8-15. Questions of fact remain as to whether these statements are defamatory and/or caused damages.

The second statement to raise an issue of fact is that Mr. Kooyman "heard" from "someone" that Mr. Sundberg "was making $10 a ton after every ton of feed he sold."  Mr. Kooyman thought that statement was "ridiculous" because "if you think about it, obviously he wasn't." Kooyman Tr., 57:12-17.  Mr. Kooyman thought the $10/ton statement was "farfetched" and that he never really took the story seriously because, if you thought about it, it would mean that Mr. Sundberg "was making about [$]40 or 50,000 a month or more." *Id*. at 58.  Mr. Sundberg's nutritional consulting services while Mr. Sundberg worked for Cargill.  Mr. Kooyman continues to use Mr. Sundberg as his nutrition consultant.  Questions of fact remain as to whether this statement is defamatory and what damages, if any, it caused.

The third statement to raise an issue of fact was made by Mr. Van Vliet to Mr. Koolhaas.  Mr. Koolhaas asked Mr. Van Vliet why Cargill sued the Progressive Defendants, but did not sue other nutritionists who left Cargill in the past.  Mr. Koolhaas recalls that Mr. Van Vliet responded that "Cargill does not go after just anybody."  Mr. Koolhaas further declared that Mr. Van Vliet never said nor implied

that the Progressive Defendants "must have done something wrong to Cargill and be guilty."  Question of fact exists as to whether this is defamatory and whether this caused damage.

### 3.    Intentional Contract Interference

Progressive argues that Cargill intentionally interfered with existing contracts it had with Mr. Schwegel, Mr. Vitoria, and several other former customers.  To prevail on the intentional interference with contractual relations cause of action, Progressive must prove: (1) a valid contract between Progressive and a third party; (2) Cargill's knowledge of this contract; (3) Cargill's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Quelimane Co., Inc. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 55 (1998).

### a.    Todd Schwegel

Mr. Schwegel, former CAN employee, resigned from CAN on January 31, 2007 to join Progressive.  Mr. Schwegel worked for Progressive Dairy Solutions from February 1-March 8, 2007.  Thereafter, Mr. Schwegel resigned from Progressive Dairy Solutions.  Progressive argues that by filing this lawsuit and using it as leverage, Cargill intentionally interfered with its employment contract with Mr. Schwegel.  Cargill argues that this cause of action fails as to Mr. Schwegel, because: (1) no employment contract existed between Mr. Schwegel and Progressive Dairy Solutions.; (2) Mr. Schwegel's decision to resign because of the acts of Progressive, not Cargill; and (3) any argument based on Cargill's filing of the instant action is protected by the litigation privilege.

For this claim to prevail, Progressive must raise a genuine issue of fact that a valid contract existed between Progressive Dairy Solutions and Mr. Schwegel.  To prove the existence of a contract between Progressive Dairy Solutions and Mr. Schwegel, Progressive presents an email exchange between Mr. Budine and Mr. Schwegel.  In an email to Mr. Budine dated January 26, 2007, Mr. Schwegel comments on what appears to be an employment contract.  The subject line of the email exchange reads, "Re: PDS Employee Agreement."  Mr. Budine responds, "Please read through the final draft of the agreement.  Let me know if you have any questions." (Marderosian Decl., Ex. 45).  While this email may raise an inference that an agreement existed viewed in a light most favorable to Progressive, Mr. Budine's testimony contradicts that inference.  Mr. Budine, in his Rule 30(b)(6) deposition, testified that

18

Progressive "had an agreement [with Mr. Schwegel] that we reviewed. It was never signed by either party." Rule 30(b)(6) depo., 151:1-2. Mr. Budine clarifies that Mr. Schwegel "quit before he signed any agreement." *Id.* at 151:25. Therefore, it is undisputed that no written employment contract existed between Mr. Schwegel and Progressive.

Progressive argues that a contract may be oral and still protected from the tortious interference from a third party. *Ramona Manor Convalescent Hospital v. CARE Enterprises, Inc.*, 117 Cal. App. 3d 1120 (1986). In support of its argument that an oral contract existed, Progressive cites to Mr. Schwegel's and Progressive's Rule 30(b)(6) deposition. (Opp. 27:6-8). Progressive failed to include these transcripts in its excepts of record presented in opposition to this motion. Thus, no genuine issue of fact is raised by these citations.

Because Progressive raises no genuine issue of fact that either a written or oral contract existed between Mr. Schwegel and Progressive Dairy Solutions, this claim is summarily adjudicated.

**b.    Tony Vitoria**

Progressive argues that Cargill intentionally interfered with the relationship between Progressive Dairy Solutions and Tony Vitoria ("Mr. Vitoria"). Mr. Vitoria signed an agreement to use Progressive on February 6, 2007. (Marderosian Decl., Ex. 44). Mr. Vitoria declares that Manuel Lima, a Cargill employee, told him that "Jonkman is taking $5 off the top of all the tons she sells you and putting it in her pocket." (Vitoria Decl., ¶2.). That conversation made Mr. Vitoria "doubt" Ms. Jonkman. Thereafter, Mr. Vitoria no longer used Ms. Jonkman and Progressive Dairy Solutions and Ms. Jonkman for their nutritional consulting services. Ms. Jonkman and Progressive Dairy Solutions continue to work for Mr. Vitoria by sampling his forages.

Progressive successfully raises issues of fact related its claim that Cargill interference with its contract with Mr. Vitoria. Therefore, this claim remains.

**c.    Others**

Progressive argues Cargill intentionally interfered with contracts between Progressive Dairy Solutions and Nelso Silveira, Rui Brasil, Sarafine Silva, Angelo Rocha, Mike Amaral, Rick Ferreira, Frank Silva, Rick Butcher, Dabe Amaral, Henry Toste, Mike Nutcher, and Larry Haworth. Progressive identifies these agreements--for the first time-- in a declaration by Mr. Budine, signed on April 24, 2008.

19

Mr. Budine declares that "Progressive had signed agreements" with the parties identified and that "these agreements were terminated as a result of Cargill's actions." However, Progressive never identified these parties in discovery. Thus, Mr. Budine's declaration is inadmissible and the information is stricken as untimely, as discussed above. Because Progressive presents no admissible evidence in support of it intentional interference with a contract related to any of these parties, summary judgment is appropriate.

In its interrogatory response, Progressive asserted that it lost the following customers as a result of Cargill's actions: Richie Heida, Hank Van Exel, RV Dairy, and Standard Cattle Co. Thus, this interrogatory response raises a question of fact on the intentional interference of contractual relations as to these parties. However, to the extent that Progressive's claims rely on statements protected by the litigation privilege, inadmissible evidence, or alleged defamatory statements and conduct herein adjudged to be non-defamatory as a matter of law, these claims fail.

**4.      Intentional Interference with Prospective Business Relations**

To succeed on a claim for intentional interference with prospective business relations, Progressive must prove: (1) an economic relationship between Progressive and a third party, with the probability of future economic benefit to Progressive; (2) Cargill's knowledge of the relationship; (3) intentional, wrongful acts by Cargill designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to Progressive proximately caused by Cargill's acts. *Della Penna v. Toyota Motor Sales, USA*, 11 Cal. 4th 376 (1995).

The same statements which purport to support defamation also support Progressive's intentional interference with prospective business relations claim. As discussed more fully above, Progressive's intentional interference with prospective business relations claim fails to the extent that it is predicated on the filing of the complaint or issuance of the news release announcing the filing of the complaint. Those statements are protected activity under California's litigation privilege.

Progressive also fails to submit evidence to support this claim as it related to Mr. Heida. Progressive alleges that Cargill employee Bill Reyes told Texas dairyman Richie Heida that the Progressive Defendants were "bad people" and were putting "hundreds of families in California out of work." To support this allegation, Progressive submits an unsigned, undated and incomplete handwritten document. (Marderosian Decl., Ex. 22). The author is identified nowhere in the document. Based on

20

this evidence, Progressive fails to support its claim.

However, Progressive submits evidence to raise a triable issue of fact as to three people on this claim.  In its interrogatory response, Progressive names Richie Heida, Bryan Kamper and Marty Poldervaart as people upon which this cause of action is based.  Cargill does not address the merits of Progressive's claim as it relates to Mr. Hamper or Mr. Poldevaart.  Moreover, Cargill did not object to the evidence above.  Therefore,  Progressive's interrogatory response raises questions of material fact on this cause of action to the extent those facts rely on admissible evidence.

**5.    Latham Act Section 43 (a), 15 U.S.C. §1125(a)**

Liability under the relevant provision of the Latham Act requires a "false or misleading representation of fact which...in commercial advertising or promotion, misrepresents the nature [or] characteristics of... another person's services or commercial activities." 15 U.S.C. §1125(a)(1).  Cargill moved for summary judgment on this claim to the extent it is predicated on Cargill's alleged defamatory statements.  Moreover, Cargill argues that the Latham Act claim fails for the additional reason that none of the statements were made as part of "commercial advertising or promotion." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999) (quoting 15 U.S.C. §1125(a)(1)(B)).

The *Coastal Abstract* court explained:

> In order for representations to constitute commercial advertising or promotions" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services.  While the representations need not be made in a "classic advertising campaign," but may consist instead of more information types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. *Id*. at 736.

Cargill asserts that Progressive fails to establish that the statements were disseminated sufficiently to the purchasing public and therefore, fails to establish the fourth essential element of this claim.  Cargill points out that Progressive, a relatively new business, has more than fifty customers, yet identifies only a handful of customers to whom the purportedly disparaging statements were made.  Cargill concludes that in a market with thousands of potential clients, the alleged disparaging statements, as identified above, do not constitute advertising.

Progressive maintains that Cargill set out on a campaign to disseminate false information about

Progressive to harm its business.  "Although [Progressive] portrays [Cargill's] dissemination as widespread...the deposition testify fails to substantiate such a claim." *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 2007 U.S. Dist. LEXIS 35520, 33 (N.D. Cal. 2007).  Progressive has only provided statements made to two customers.  Because Progressive operates throughout several states in the United States, the market is not relatively limited.  Therefore, evidence that only a few statements were made is not enough to trigger protection from the Latham Act.  *Coastal Abstract*, 173 F.3d at 735.  Accordingly, this claim fails.

**6.      Business Disparagement/False Advertising**, **Cal. Bus. & Prof. Code §17500**

California Business and Professions Code section 17500 makes it unlawful for any person, corporation, or employee to "make or disseminate or cause to be disseminated...in any manner or means...any statement which is untrue or misleading" and is in connection with the sale of personal property.  To prevail on this claim, Progressive must show that (1) Cargill intentionally disseminated untrue or misleading statements, (2) the statements were deceptive, and (3) Progressive was harmed as a result of the statements.

This cause of action is summarily adjudicated to the extent Progressive's false advertising claim relies on Cargill's claims in this lawsuit.  *See Chip-Mender, Inc. v. Sherwin-Williams Co.*, 2006 U.S. Dist. LEXIS 2176 (N.D. Cal. 2006) (until court found a patent was invalid, any claim in advertisements or on a website that its products were patented was not an untrue or misleading statement for purposes of Bus. & Prof. Code §17500).

Cargill argues further that, similar to the Latham Act claim above, this claim fails because it was not "made or disseminated before the public."  As discussed above, Progressive maintains that Cargill widely disseminated false and disparaging statements about Progressive.  Pursuant to the statute, the false or misleading statement must be "made or disseminated before the public...in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet...."  Cal. Bus. & Prof. Code §17500.  A plain reading of this statute reveals that the misleading statement must be disseminated beyond a few individual statements.  The alleged misleading statement must be disseminated to the public through a newspaper, internet, or other means to communication to a significant number of people.  Progressive does not oppose this

argument and offers no contradictory authority.  Thus, the evidence offered does not support its claim that the publication was disseminated widely to the public.  Accordingly, summary judgment is granted on this claim.[12]

## C.  Claims Related to Alleged Unfair and Fraudulent Practices

Progressive alleges that Cargill committed a number of unfair business practices, such as : (1) refusal to do business with Progressive Dairy Solutions and its customers; (2) refusal to do business with third party vendors who work with former Cargill employees; (3) Cargill's "slowing down" the process of bringing in the ingredients to create Progressive's premix; and (4) misappropriation and misuse of Progressive's premix.  Progressive also alleges that Cargill engaged in the following unfair, unlawful, and or fraudulent business acts or practices: (1) concealment of the truth about their unlawful and unethical feed formulation practices; and (2) filing this lawsuit without legal or factual basis in order to conceal the unlawful and unethical formulation practices.  Cargill argues that the alleged unfair business practices are protected by the competition privilege.  Additionally, Cargill argues that the alleged fraudulent communications are protected by the litigation privilege.  The Court discusses each argument as they relate to the causes of action below.

## 1.    Common Law Unfair Competition

California's common law unfair competition prohibits "competition against a business rival by taking and using as one's own that which belongs to the competitor."  *Chatton v. National Union First Ins. Co.*, 10 Cal. App. 4th 846, 863 (1992).  This cause of action is "generally synonymous with 'passing off' one's goods as those of another."  *A-Mark Fin. Corp. v. Cigna Property & Casualty Cos.*, 34 Cal. App. 4th 1179, 1188 (1995).  This Court declines Progressive's invitation broaden the application of California's common law tort of unfair competition to any alleged unfair business practice.  Accordingly, summary adjudication is appropriate to the extent that Progressive fails to raise an issue of fact as to whether Cargill took and used Progressive's product.

Progressive raised questions of fact in its opposition that may be applicable to this cause of action;

---

[12]Progressive provides evidence that Cargill Vice President Chuck Warta wanted to disseminate information about the lawsuit "to plant a seed that...we are not so comfortable with the way these past employees...plan on operating." (Marderosian Decl., Ex. 34, Warta email re: Pac Coast Communication Outline").  However, Progressive provides no evidence that this occurred.

namely, whether Cargill misappropriated Progressive's premix. Cargill does not oppose these allegations effectively. Accordingly, to the extent Progressive raised genuine issues of fact related to Cargill's misappropriation of Progressive's premix, Progressive may proceed with this cause of action.

**2.    Statutory Unfair Competition, Cal. Prof. & Bus Code. §17200**

California Business and Professions Code section 17200 defines unfair competition as: (1) unlawful, unfair, or fraudulent business acts or practices; (2) unfair deceptive, untrue, or misleading advertising; and (3) any act prohibited by Chapter 1 (which involves advertising).    The scope of California's unfair competition law is "sweeping, embracing anything that can properly be called a business practice and at the same time is forbidden by law." *Rubin v. Green*, 4 Cal.4th 1187, 1200 (1993) (quoted in *Cal-Tech Comm. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)). A practice may be deemed "unfair even if not specifically proscribed by some other law." *Cal-Tech Comm.*, 20 Cal. 4th at 180.

**a.    *Burford* Action**

Progressive bases its claim mainly on events related to the *Burford* action. The Progressive Defendants allege that after the *Burford* action was filed, while they were still CAN employees, their clients asked them whether there was any truth to the allegations that Cargill was secretly changing feed formulations and demanded assurances that Cargill was not changing the feed formulations without notice. Progressive argues that Cargill fraudulently denied the allegations of the *Burford* action. Cargill argues that communications Cargill made to its employees in connection with the *Burford* action are protected by the litigation privilege.

As discussed more fully above, the litigation privilege protects "any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside and courtroom and no function of the court or its officers is involved." *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990). Cargill's communication made to the Progressive Defendants, who were Cargill employees at the time the communications were made, are protected by the litigation privilege. Cargill communicated this information to achieve the objects of the litigation. Progressive argues that Cargill's denial of the allegations harmed their reputation. However, Cargill's denial of the allegations was made as part of its strategy to defend an ongoing and unresolved lawsuit.

24

Moreover, the communications are has some connection or logical relation to this action. *Jacob B. v. County of Shasta*, 40 Cal. 4th 948, 955 (2005). Indeed, Progressive's counterclaim puts the *Burford* action directly at issue. Therefore, to the extent this claim is based on communications Cargill made to its employees about the *Burford* action, this claim is barred.

**b.     Other Alleged Unfair Practices**

As discussed more fully above, Progressive asserts that Cargill engaged in a number of unlawful and unfair business practices. Cargill generally argues that the practices described by Progressive are acts of competition, not unfair business practices. Cargill argues that there is a "long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). While Cargill may choose to do business with whomever it chooses, questions of fact remain as to whether Cargill engaged in a course of conduct which involved unfair business practices. Accordingly, to the extent that Progressive raised issues of fact concerning Cargill's alleged unlawful and unfair business practices, summary judgment of this claim is denied.

**3.     Fraud**

The elements of fraud are: (a) misrepresentation; (b) knowledge of falsity; (c) intent to defraud; (d) justifiable reliance; and (e) resulting damage. Here, Progressive argues that Cargill misrepresented what feed formulations it was giving to dairyman, knew that it had switched the formulations, and intended to defraud the dairyman. Progressive Defendants argues that they justifiably relied on Cargill's denial and, as a result, their reputations were harmed in the community. As discussed above, Cargill's communications related to its defense of the *Burford* action are protected by the litigation privilege. Therefore, Progressive has not raised genuine issues of material fact as to any theory of fraud that is not privileged communication or for which they have standing. Accordingly, the Court grants summary judgment on this claim.

**D.  Miscellaneous Claims**

**1.     Unjust Enrichment**

Cargill argues that unjust enrichment is "merely a theory of recovery." "There is no cause of action in California for unjust enrichment." *Melchior v. New Line Productions, Inc.*, 106 Cal. App. 4th

25

779, 794 (2003). Accordingly, as a matter of law, Progressive's unjust enrichment claim fails as a cause of action. However, to the extent that Progressive proves it is entitled to restitution on any prevailing claims, it is entitled to recover on this theory.

**2.     Conspiracy**

Similarly, in California, civil conspiracy "is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994) (quoting *Wyatt v. Union Mortgage Co.* 24 Cal.3d 773, 784 (1979)). In a civil conspiracy action "the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity." The elements for a civil conspiracy cause of action are: (1)  the formation and (2)operation of the conspiracy, and (3) "damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Applied Equipment*, 7 Cal. 4th at 511. Therefore, as a matter of law, Progressive's civil conspiracy claim fails as a cause of action.[13]   However, to the extent that Progressive proves the elements of civil conspiracy between Cargill, Inc. and CAN related to any prevailing cause of action, Progressive is entitled to recover damages from each entity.

**3.     Unfair Trade Practices, Cal. Bus. & Prof. Code §17000 *et seq*.,**

Progressive dismissed its Unfair Trade Practices, Cal. Bus. & Prof. Code §17000 *et seq*., claim as it related to Progressive's allegations of below-cost pricing of beef blood meal. (Doc. 263). Cargill argues that this claim rested solely on its below-cost pricing allegations. Thus, with no allegations related to this claim, Cargill argues that summary judgment is warranted.

In its stipulation to dismiss, Progressive agreed to dismiss the factual allegations pertaining to blood meal only. The parties specifically agreed that this claim "shall not be dismissed as to other factual allegation that have been revealed during the course of discovery." (Doc. 263). Progressive maintains

---

[13]In the alternative, Cargill relies on *Copperweld Co. v. Independence Tube Co.*, 467 U.S. 752 (1984) for its position that Progressive's conspiracy claim fails. *Copperweld* is inapplicable, however, since its holding is specific to the "concerted action" element of a claim made pursuant to Section One of the Sherman Act. Progressive asserts a claim for civil conspiracy.

26

that this cause of action is still viable.

Cargill did not present evidence that negates an essential element of the nonmoving party's case. Cargill failed to demonstrate that Progressive failed to make a showing of sufficient evidence to establish to establish this claim. Accordingly, Cargill did not carry its initial burden to prove it is entitled to summary judgment on this claim. *Celotex,* 477 U.S. at 322. Accordingly, to the extent that Progressive has admissible evidence to support a claim not related to its below-cost pricing allegations, it may proceed with this cause of action.

## V. CONCLUSION AND ORDER

For the foregoing reasons, this Court:

1.      GRANTS in full Cargill's motion for summary judgment on the following Progressive counterclaims:

(a) Latham Act Section 43(a), 15 U.S.C. 1125(a) claim (count 1);

(b) Statutory Unfair Competition, Cal. Bus. & Prof Code 17200 (count 3);

(c) Business Disparagement/False Advertising (count 9);

(d) fraud (count 13);

(e) unjust enrichment (count 18). Although this cause of action fails as a matter of law, Progressive is entitled to restitution to the extent it proves restitutionary damages on any prevailing claims.; and

(f) civil conspiracy (count 19). Although this cause of action fails as a matter of law, Progressive is entitled to recover damages from bo th joint-tortfeasors, if any, to the extent that Progressive proves the elements of a civil conspiracy and damages.; and

2.      GRANTS in part and DENIES in part, consistent with this opinion, Cargill's motion for summary judgment on the following Progressive counterclaims:

(a) common law unfair competition (count 2). Summary judgment is denied to the extent that Progressive raises a triable issue of fact related to Cargill's misappropriation of Progressive's premix.;

(b) Unfair Trade Practices, Cal. Bus. & Prof. Code 17000, *et seq*. (count 8). Summary judgment is denied to the extent that Progressive has admissible evidence to support a

claim not related to its below-cost pricing allegations.;

(c) defamation/commercial disparagement (count 10).  Summary judgment is denied to the extent that Progressive raises triable issues of fact related to the three statements identified in this opinion as having unresolved questions of fact (*infra*, pp. 17-18).;

(d) intentional interference with contractual relations (count 11).  Summary judgment is denied to the extent that Progressive raises a triable issue of fact related to Tony Vitoria.; and

(e) intentional interference with prospective business relations (count 12).  Summary judgment is denied to the extent that Progressive raises triable issues of fact raised in its Interrogatory Response, identifying Richie Heida, Bryan Kamper, and Marty Poldervaart as people upon which this cause of action is based.

IT IS SO ORDERED.

Dated:    **May 29, 2008**                              _____/s/ Lawrence J. O'Neill_____
                                                                    UNITED STATES DISTRICT JUDGE